Pro Se 1 (Rev. 12/16) Complaint for a Civil Case

# UNITED STATES DISTRICT COURT
for the
District of Columbia
Civil Division

)
)   Case No.    **20-CV-2000-CRC**
)   ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Stephen K. Grivnow                     )        *(to be filled in by the Clerk's Office)*
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾       )
*Plaintiff(s)*                         )   Jury Trial: *(check one)*  **[✔ ]** Yes  **[  ]** No
*(Write the full name of each plaintiff who is filing this complaint.*   )
*If the names of all the plaintiffs cannot fit in the space above,*      )
*please write "see attached" in the space and attach an additional*      )
*page with the full list of names.)*                                     )
              **-v-**                   )
                                        )
Muriel Bowser, Dr. Lewis D. Ferebee, Kaitlyn   )
Girard, Jade Fuller, D. Scott Barash, David    )
Pinder, Nadine Smith, Errol Johnson            )
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾       )
*Defendant(s)*                          )
*(Write the full name of each defendant who is being sued. If the*       )
*names of all the defendants cannot fit in the space above, please*      )
*write "see attached" in the space and attach an additional page*        )
*with the full list of names.)*

1 of 33

**COMPLAINT FOR A CIVIL CASE**

# I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Stephen K. Grivnow |
| Street Address | 12024 Taliesin Place Unit #33 |
| City and County | Reston, Fairfax County |
| State and Zip Code | Virginia, 20190 |
| Telephone Number | (412) 779-6268 |
| Email Address | stephengrivnow@gmail.com |

**The Defendant(s)**

All defendants that are party to this complaint have given rise to a cause of action _both in their official capacities as employees of DC Public Schools and as individuals._

Exceptions:  Defendant #1 (Muriel Bowser) and Defendant #5 (D. Scott Barash) have given rise to a cause of action only in their official capacities – not as individuals.

Defendant No. 1

| | |
|---|---|
| Name | Muriel Bowser |
| Job or Title *(if known)* | Mayor of Washington, D.C. |
| Street Address | 441 4th St. NW |
| City and County | Washington |
| State and Zip Code | District of Columbia 20001 |
| Telephone Number | (202) 727-2643 |
| Email Address | eom@dc.gov |

Defendant No. 2

| | |
|---|---|
| Name | Dr. Lewis D. Ferebee |
| Job or Title *(if known)* | Chancellor of DC Public Schools |
| Street Address | 1200 First St NE 10th floor, Washington, DC 20002 |
| City and County | Washington |
| State and Zip Code | District of Columbia 20002 |
| Telephone Number | (202) 442-5885 |
| Email Address | Chancellor@k12.dc.gov |

Defendant No. 3

| | |
|---|---|
| Name | Kaitlyn Girard |
| Job or Title *(if known)* | Chief of Labor Management and Employee Relations of DC Public Schools |
| Street Address | 1200 First St NE 10th floor, Washington, DC 20002 |
| City and County | Washington |
| State and Zip Code | District of Columbia 20002 |
| Telephone Number | (202) 442-5885 |
| Email Address | Kaitlyn.girard@dc.gov |

Defendant No. 4

| | |
|---|---|
| Name | Jade Fuller |
| Job or Title *(if known)* | Labor Management and Employee Relations Manager of DC Public Schools |
| Street Address | 1200 First St NE 10th floor, Washington, DC 20002 |
| City and County | Washington |
| State and Zip Code | District of Columbia 20002 |
| Telephone Number | (202) 442-5885 |
| Email Address | Jade.Fuller@k12.dc.gov |

Defendant No. 5

| | |
|---|---|
| Name | D. Scott Barash |
| Job or Title *(if known)* | General Counsel for DC Public Schools |
| Street Address | 1200 First St NE 10th floor, Washington, DC 20002 |
| City and County | Washington |
| State and Zip Code | District of Columbia 20002 |
| Telephone Number | (202) 442-5885 |

| | |
|---|---|
| Email Address | Scott.Barash@dc.gov |

Defendant No. 6

| | |
|---|---|
| Name | David Pinder |
| Job or Title *(if known)* | Superintendent – Cluster IX (DCPS) |
| Street Address | 1200 First St NE 10th floor, Washington, DC 20002 |
| City and County | Washington |
| State and Zip Code | District of Columbia 20002 |
| Telephone Number | (202) 442-5885 |
| Email Address | David.Pinder@dc.gov |

Defendant No. 7

| | |
|---|---|
| Name | Nadine Smith |
| Job or Title *(if known)* | Principal – Dunbar High School (DCPS) |
| Street Address | 101 N St NW |
| City and County | Washington |
| State and Zip Code | District of Columbia 20001 |
| Telephone Number | (202) 698-3762 |
| Email Address | Nadine.Smith@k12.dc.gov |

Defendant No. 8

| | |
|---|---|
| Name | Errol Johnson |
| Job or Title *(if known)* | Assistant Principal – Dunbar High School (DCPS) |
| Street Address | 101 N St NW |
| City and County | Washington |
| State and Zip Code | District of Columbia 20001 |
| Telephone Number | (202) 698-3762 |
| Email Address | Errol.Johnson@k12.dc.gov |

## Introduction to Complaint

1.      Plaintiff Stephen K. Grivnow is a licensed and certified DC Public Schools Teacher, having spent the entirety of his professional career in Washington, D.C. at The Historic Paul Laurence Dunbar High School. Over the course of multiple years, he has been harassed due to his unwillingness to capitulate to unreasonable and illegal demands of teachers at the hands of administrators, pointing out the harmful effects to staff and students of certain school systems – such as the IMPACT evaluation system.

2.      Plaintiff has regularly reported abuse, fraud, contract violations, and illegal activity that harms students.

3.      The primary source of retaliation against the plaintiff has been through the use of "IMPACT," a teacher evaluation system. Bad Actors use IMPACT as a weapon to lower a teacher's score. IMPACT is used as a way to frighten teachers to acquiesce to administrators' demands to change grades, attendance records, etc. IMPACT is used as a way to stop a teacher from fighting for the rights of his fellow teachers and for fighting for the rights of his students. IMPACT creates a culture of fear amongst staff and has created an impetus to make statistics look good at the expense of the students. IMPACT is a significant cause of teacher turnover; the exodus of teachers that leave Dunbar every year contribute to a cycle of substandard achievement at the school, given few teachers stay and grow professionally at the school or make commitments to the Dunbar community.

4.      Teachers that try to hold administrators accountable to the school community are faced with punishments such as unfair IMPACT scores, pay stagnation, loss of professional opportunities, loss of extra duty assignments, and other penalties.

5.      This Complaint asserts that Defendant Principal Nadine Smith is a Bad Actor who willfully and knowingly violated IMPACT procedures by completely fabricating one observation and schemed to artificially produce an untenable overall score that illegitimately conferred upon the plaintiff a category designated as "Ineffective," which, ultimately, on July 19, 2019 led to an illegal separation from his job at DCPS.

**6.**     All the while, defendants Johnson, Pinder, Girard, Fuller, Barash, and Ferebee contributed to -- or supported -- the truth that plaintiff's IMPACT score was illegally manipulated for the sole purpose of separating plaintiff from his position at Dunbar High School as it is likely they thought plaintiff was considered a 'problem teacher' and responsible for the dismissal of a previous Dunbar principal upon confirmation of illegal activity that happened under his watch.   Defendants mentioned above are Bad Actors with full knowledge the plaintiff's IMPACT score was illegally manipulated; yet, such behavior was permitted and encouraged.   Additional facts regarding the fraudulent observation in question are as follows:

**7.**     Petitioner was not observed by an original deadline but an extension was afforded to the administration to complete the observation.

**8.**     In an April 8th, 2019 SCAC meeting (SCAC stands for 'School Chapter Advisory Committee' and is supposed to iron out building issues between administration and union members) with Washington Teachers Union (WTU) President Liz Davis present, Principal Smith agreed that the IMPACT observer for the plaintiff should not be herself due to conflicts with the petitioner in the past and assigned someone else to the job.

**9.**     A false IMPACT score of a 1.2 (which is very poor) was uploaded into the IMPACT database by Principal Smith, indicating that an official observation had purportedly taken place.   The "observer" that authored the description of the "class observation" was Principal Nadine Smith.   However, Principal Nadine Smith never observed any of petitioner's classes for the observation in question.   This has been substantiated by written statements from other co-teachers in all of the classes the plaintiff teaches in; students in all of the classes that the plaintiff teaches in; and by other administrators on the floors that the plaintiff teaches.   Evidence was gathered from all sources since the plaintiff did not even know what class the IMPACT observation was written up about.

**10.**     False IMPACT notes were uploaded into the IMPACT database by Principal Smith, indicating that an official post-IMPACT conference took place on April 10th, 2019.   The "ghost conference" that

took place was alleged to have been conducted by Principal Nadine Smith.  Petitioner never received any notice via any type of media to alert that a post-conference would be conducted -- *because such an IMPACT observation never took place.*

11.     Petitioner only discovered the completely fabricated IMPACT Observation later when he heard an administrator's walkie-talkie go off at the end of the period "We only had until 4th period to get him!"  5th period (last period) was a planning period on the day in question when an IMPACT score was totally fabricated by Principal Nadine Smith.

12.     On the day in question when a false observation was fabricated by Principal Nadine Smith, the plaintiff would have been teaching these classes, which again all students and staff ever denied seeing Principal Smith attend:

   o   Pre-Calculus (1st Period)

   o   Algebra II (2nd Period)

   o   Probability and Stats (4th Period)

13.     Petitioner is an active and outspoken WTU and SCAC member.

14.     Defendant Nadine Smith has a history of abusing IMPACT against other teachers, both at Dunbar and at other sites.  The state of Dunbar the school was in bad shape after her takeover and things only got worse:  there was increased fighting amongst students; there was disenfranchisement among much of the staff who were blamed when things went wrong; and there was a culture of fear that permeated throughout the building.  Principal Smith conferred highly-rated IMPACT ratings on those staff members she liked, but never followed the procedures for (for example, rating someone highly rated but only observing 1/6 of the required lesson).  Principal Smith didn't even try to write anything concrete in her "writeup" of the observation.  Everything is written in generic terms (e.g., the "learning activity" since Principal Smith had no idea what was in the plaintiff's lesson).  Teacher comments never changed from the first observation.  Nothing was truly collaborative with Principal Smith.  She had become irritated that

the plaintiff was insisting that Dunbar staff work on an INSIGHT survey that revealed gaps in leadership and culture within the building, amongst other things.

15.     A few days later when approached by petitioner about the discrepancy between not being observed and having an IMPACT score, Principal Nadine Smith offered no rebuttal to the accusations and offered no remedy to alleviate the allegations other than to "go through official channels."  She likely did this because at this point, a conspiracy was underway within the Bad Actors / defendants of DCPS to support her fabrication of that score as well as her machinations and schemes to manipulate the plaintiff's overall score.  A complete denial of their fiduciary to investigate could keep a grievance suspended indefinitely from being heard.  Any reasonable person could look at the evidence and come to the conclusion Principal Nadine Smith lied about observing the plaintiff.  Evidence of statements and even video testimony were laid out for the defendants to verify, even though it would only take a few minutes to do so and vindicate the plaintiff.

> **Commented [SZG1]:** Shouldn't this say "Any reasonable person…"?

16.     Instead Bad Actor David Pinder -- who has a history of supervising crooked principals from poorer areas of the city, with schemes being outed at Dunbar, Ballou, and Anacostia, amongst other locations -- had the audacity to refuse to investigate under his legal fiduciary duty to do so (other than to say that videotapes of the hallways that would show Principal Smith nowhere near the plaintiff that day were "lost" or "erased" on the day of the fake observation), but instead he incredulously wrote up a discipline against the plaintiff for reporting Principal Nadine Smith to various investigatory bodies such as the Office of Integrity of DCPS.

17.     The Office of Integrity of DCPS is supposed to act as the "Chancellor's Designee" that handles complaints, working "with staff, parents, and the greater community to ensure integrity and strong practices in DC public schools" …. The office is supposed to serve as a "one stop shop" for matters amongst staff, students, and families that require intervention or mediation.  Plaintiff never heard back from the Office, despite several attempts to contact them.  "The Chancellor's Designee" failed here.

18.     Chancellor Ferebee failed on several more occasions to end the ridiculousness that ultimately led to plaintiff's illegal separation from Dunbar.  Chancellor Ferebee was copied on several emails containing the ample evidence against Principal Nadine Smith (and Superintendent Pinder).  Chancellor Ferebee also had a brief face-to-face conversation with the plaintiff about his case when meeting at the WTU headquarters in June of 2019 for a contract meeting.  When apprised in person of what happened to the plaintiff, Chancellor Ferebee should have said "That shouldn't happen."  Yet, he did nothing about it; instead, when a 'Chancellor's Appeal' was sent to the plaintiff regarding a revocation of DCPS's decision to terminate employment, the letter described Chancellor Ferebee having "personally denied" the appeal. Keep in mind that all it would take is a 10-minute investigation to clear the plaintiff's name.  DCPS has refused to do even that.

19.     Abusing IMPACT is at the heart of how DCPS manipulates teachers and statistics to conform to what we want to see about a school, not just what truly is.  Petitioner was at the forefront of exposing truths and conflicts when Dunbar High School was under the principalship of Abdullah Zaki III when it was alleged this former principal:

- Used IMPACT to get rid of teachers active in the WTU and/or opposed his policies and initiatives

- Violated several aspects of the CBA

- Illegally offered student a program of study in Twilight classes only, when their behavior could not be controlled in day classes and when the Twilight program was not up to standards to offer the requisite Carnegie Credits

- Under-reported suspensions

- Pressured teachers to change grades or pass students

- Tampered with attendance records -- including those of graduating seniors -- in order to comply with official policy that was previously enforced

**20.**     These findings gained traction in the independent agency *Marsel & Alvarez* report released 1/26/19, substantiating petitioner's claims about what had been happening on an illegal and immoral basis at Dunbar High School.

**21.**     Valid considerations such as large class size, lack of planning, etc. that plaintiff was concerned about end up IMPACTing principal's own IMPACT scores (as well as higher officials) if official grievances are filed.  Thus, Principal Smith once slurred plaintiff's last name at a SCAC meeting:  "Mr. Grivnow" became "Mr. Grieve-no."  Such language was very inflammatory and hateful towards the plaintiff, creating a hostile working environment.  Furthermore, Principal Nadine Smith lied in public forums in school about always matching up an observation with [an] IMPACT score.  It was clear that the plaintiff had his IMPACT manipulated, though Principal Smith made it appear to the Dunbar staff that the plaintiff was being delusional.

**22.**     Consider what happened to the plaintiff for the IMPACT observation previous to the one in question:  Highlights from the first observation include:

- Observing the petitioner during an illegal class size of 35 students, including some students with very high needs

- Observing the petitioner when his Thanksgiving bus was extremely late, but out of a sense of duty, petitioner reported to work anyway despite no sleep

- Observing the petitioner during a class that was not supposed to have been academic in nature anyway (the petitioner was told that behavior team was supposed to lead a restorative justice circle)

23.     Principal Nadine Smith took measures to try to ensure that observation was as procedurally passable as possible – even though, under the circumstances as described, such a high-stakes IMPACT observation would be tantamount to a morally questionable practice.  Therefore, the first observation is not a valid assessment of the petitioner's effectiveness as an instructor and needs to be removed.  The petitioner asserts that there has been deliberate and calculated efforts for an "aha gotcha!" moment with respect to his IMPACT observations.

24.     The petitioner also asserts that, emblazoned by what she was able to write up in the Cycle I observation, Principal Nadine Smith had no qualms in making up a deliberately fictious Cycle II observation and a deliberately fictious Cycle II post-observation conference.  Upon a meeting with Dr. Pinder to resolve this event, the plaintiff still did not even know what class Principal Nadine Smith was referring to when she wrote up a contrived IMPACT score. In this meeting, Principal Nadine Smith initially said the observation took place at a certain time (at 9:30am) but when presented with evidence from my co-teacher at that time, vacillated and changed her account to 10:25am.  Yet for this class (Algebra II) all students wrote and made videotape evidence that Principal Smith never came in the room.

25.     DCPS is grounding its decisions to ignore the truth by dragging this out.  As the narrative wound up in human relations, still no one investigated.  Instead, Jade Fuller looking at the case purposefully ignored evidence supplied by another administrator on my floor, which would have vindicated me.  She was pressured by Kaitlyn Girard – her supervisor – who said that the plaintiff was "crazy" but yet never bothered to look at the evidence either.  Scott Barash had the complaint in legal for over a month – further delaying (and ultimately denying) plaintiff's right to relief.

26.     Mayor Bowser has been aware of the legacy of IMPACT and the stressful conditions that create an environment for scandal (e.g., Ballou 100% graduation, Dunbar attendance, etc.).  The *Alvarez & Marsal* report revealed instances of principal evaluators who weaponize IMPACT.  Ms. Bowser is ultimately in charge of the DC Public Schools, as they are under mayoral control.  Plaintiff contacted her office and provided evidence as to what was going on.  One of the mayor's staff promised to provide the

plaintiff legal help for whistleblowing, but after a while all communication stopped from the mayor's side.

27.     Furthermore, Cycle II of arbitrary CSC (Community & School Culture) in 2018-19 should have been a "4" instead of a "3."  However, the evidence will show that Principal Nadine Smith purposefully and at the last minute thwarted petitioner's attempts to conduct an outing for Dunbar students on dragon boats in order to lower his CSC score.  She had been completely receptive and pushed for this trip all year long, until it was decided by all of the Bad Actors / defendants to tag the plaintiff for termination.

28.     Even more audacious is that petitioner's TAS (value added) score was turned over in time to AP Errol Johnson in charge of evaluating.  All evidence from standardized tests scores and student projects that comprised petitioner's TAS was given and a score calculated to be a 3.8.  However, petitioner's TAS score was mysteriously converted to a 1.3 for no reason nor explanation (other than the obvious: that a 1.3 was the highest score allowed in the IMPACT formula that would have tagged the plaintiff as "ineffective" and ensure plaintiff's illegal separation from DCPS).  A recent SCAC meeting had declared that anyone that wants to review their TAS score with their evaluator has the right.  Plaintiff asked (and even submitted in writing) AP Johnson that he required a review.  No review was given.

## II.   Basis for Jurisdiction

**29.**     Plaintiff's constitutional claims arise under the U.S. Constitution and are brought pursuant to 42 U.S.C. § 1983, which authorizes constitutional actions against District of Columbia officials acting under the color of D.C. law, and pursuant to 28 U.S.C. § 2201, which authorizes actions for declaratory judgments.

**30.**     Because Plaintiff's claims arise under federal law, this Court has subject matter jurisdiction pursuant to 28 U.S.C. 1331.

**31.**     Plaintiff also challenges some defendants' knowledge of previous illegally changed attendance records; evidence of grade tampering; and evidence of a scheme to have students cheat on district-wide assessments, which are tantamount to violations of the D.C. Administrative Procedure Act, D.C. Code § 2-510.

**32.**     Furthermore, plaintiff has claims for jurisdiction under D.C. Codes § 1–615.53 and § 2–1402.61 for refusing to participate in illegal activities and has subsequently been retaliated against.  School officials have consistently violated the D.C. Whistleblower Protection Act § 1–617.02 in relation to the plaintiff for heroic advocacy on the parts of D.C. public school teachers and D.C. public school students. In addition, the defendants have, by extension, violated the Whistleblower Act 5 U.S.C. 2302(b)(8)-(9) cementing jurisdiction in this court.  Furthermore, § 1–617.02 and § 1–617.04 were not used for their intended purpose by DC Public School Officials, again laying jurisdictional claim for this court.

**33.**     This Court may exercise supplemental jurisdiction over Plaintiffs' D.C. Claim pursuant to 28 U.S.C. § 1367.  In addition, it is within this court's purview to oversee violations of federal labors such as those detailed in National Labor Relations Act § 8. A. 3.  Moreover, Principal Nadine Smith committed violations of DC Municipal Code § 22–3221 (fraud) as did all of the Bad Actors/defendants that conspired to cover up her faking of an IMPACT score and related machinations.

**34.**     Venue is proper in this judicial district pursuant to 28 § U.S.C.1391 because the events and omissions giving rise to Plaintiffs' constitutional and statutory claims occurred in this district, and this

Court has personal jurisdiction over Defendants.

**35.**     Note that a dollar amount in this complaint exceeds $75,000 excluding interest and court costs as detailed further in 'Prayer for Relief.'

## III.  Statement of Claim

Claims for Relief:

Claim One:

**Violation of the Fifth Amendment of the U.S. Constitution**

**36.**     Plaintiff incorporates by reference the factual allegations in the forgoing paragraphs.

**37.     Fed. R. Civ. P. 8(a)(2) statement:** Defendants' actions violate plaintiff's rights and those of his students under the United States Constitution.

**38.**     The United States Supreme Court in *Bolling v. Sharp* held that the Due Process Clause of the 5th Amendment applies to Washington, D.C. and incorporates the Equal Protection Clause.

**38.**     Segregation and inequality in public education is an arbitrary deprivation of liberty in violation of the Due Process Clause.  Students who are sent to Dunbar High School or attend the institution as their neighborhood school have had their rights abridged as a result of defendants' maintenance of an evaluation program (IMPACT) that results in record amounts of teacher turnover at their school. Research has shown better outcomes for all parties when teaching professionals are stable at a school. Thus, the IMPACT program as currently administered does not comply with the law.

**39.**     Parents of students at Dunbar have a right to be listened to.  Their testimony to the effect of not wanting to lose the plaintiff as a teacher for their children was summarily dismissed without consideration since the main objective has been to continue to churn teachers over, especially targeting ones such as the plaintiff who stands up for his rights and for the rights of his students.

Claims for Relief:

Claim Two:

**Breach of Contract:  Violation of the Washington Teachers Union Collective Bargaining Agreement**

**40.**     Plaintiff incorporates by reference the factual allegations in the forgoing paragraphs.

**41.     Fed. R. Civ. P. 8(a)(2) statement:** Defendants violated broad sections of the collective bargaining agreement, including but not limited what is contained below this statement.

(a) Article 2 of the Collective Bargaining Agreement (CBA) § 2.1.1:

"… partnership requires open communication, trust, respect, collaboration, shared decision making, and compliance with all agreements …"

(b) Article 3 of the CBA (Fair Practices) § 3.1:

"DCPS shall not discipline, retaliate against, or discriminate against any Teacher on the basis of:

3.1.1. Membership in any educator organization;

3.1.2 Association with the activities of the WTU; or

3.1.3 For requiring that DCPS adhere to the terms of [the CBA]

(c) Article 15 of the Collective Bargaining Agreement (CBA) – Evaluation

i.  DCPS violated their own rules on IMPACT implementation, including but not limited to:

1. **IMPACT 2018-19 Special Educators Group 3 Booklet of Procedures:**
   a.  Page 2: Providing Frequent and Meaningful Feedback

2. **IMPACT 2018-19 Special Educators Group 3 Booklet of Procedures:**

   a. Page 7: Who conducts observations

   b. Page 7: Number of IMPACT observations

3. **IMPACT 2018-19 Special Educators Group 3 Booklet of Procedures:**

   a. Page 8: Length of IMPACT observation

   b. Page 8: Additional Information about an observed class

   c. Page 8: Feedback from an IMPACT observation

4. **IMPACT 2018-19 Special Educators Group 3 Booklet of Procedures:**

   a. Pages 10-28: Five Essential Practices

(d)  Article 7 of the CBA (Progressive Discipline)

(e)  Article 6 of the CBA (trying to settle a dispute as early as possible)

Claims for Relief:

Claim Three:

**DC Compulsory School Attendance and Expulsion Act
and
DC Focused Achievement Amendment Act of 2013**

42.  Plaintiff incorporates by reference the factual allegations in the forgoing paragraphs.

43.  Plaintiff sues the Bad Actors individually and as members of agents of D.C. Public Schools who are bound under the law to the DC Compulsory School Attendance and Expulsion Act and DC Focused Achievement Amendment Act of 2013

44.  **Fed. R. Civ. P. 8(a)(2) statement:** Defendants' actions and the intentional weaponized use of IMPACT against the plaintiff was performed, in part, to skew key measurables contained in the aforementioned laws and to adversely affect the work conditions of the plaintiff, who is entitled to judicial review.

45.  Plaintiff fought for accurate reporting of key measurables such as school attendance and student grades.  Plaintiff Nadine Smith utilized (and continues to utilize) the current implantation of IMPACT against teachers and fellow administrators to manipulate pressures and conditions to skew these key measurables that portray the school in a more favorable light.  Beyond the defendants specifically targeting the plaintiff through intentional, weaponized use of IMPACT, the overall implementation of IMPACT across DCPS is unfair and has been widely exploited by administration at the expense of teachers.

Claims for Relief:

Claim Four:

**DC Whistleblower Protection Act**
**and**
**Federal Whistleblower Protection Act**

46.     Plaintiff incorporates by reference the factual allegations in the forgoing paragraphs.

47.     **Fed. R. Civ. P. 8(a)(2) statement:** Plaintiff sues the District of Columbia under the D.C.

Whistleblower Protection Act and Federal Whistleblower Protection Act, as Defendants

unlawfully lowered his IMPACT evaluation in retaliation for (1) plaintiff's filing of union

grievances and (2) plaintiff's co-operation with the *Alvarez and Marsal* report in January 2018

that led to the public disclosure of falsifying school attendance records.

48.     Plaintiff sues the District of Columbia Public schools, its agents-defendants herein as Bad Actors,

both individually and as official managers of the school system.  One bad actor in particular –

Principal Nadine Smith – unlawfully lowered plaintiff's IMPACT evaluation score as a "**hostile and**

**retaliatory action,"** in part, for being an active WTU member who has sought to hold Principal Smith

and Principal Smith's administration accountable to the agreements in the Collective Bargaining

Agreement.

49.     Plaintiff asserts that the motivation for such illegal and immoral methodology of determining

IMPACT scores by Principal Nadine Smith against Mr. Stephen Grivnow are primarily due to:

  ▪   Plaintiff's filing of Grievances against Dunbar's Administration for, but not limited to:

  ●   CSC IMPACT policy violations

  ●   CP IMPACT policy violations

  ●   LEAP / Morning Block violations

  ●   Class Size violations

50.     These grievances could negatively IMPACT Principal Smith's IMPACT so she had a motivation to remove plaintiff from his position.   Other Defendants / Bad Actors had motivation to get rid of the plaintiff from his position due to his past participation in union activities and his participation in the *Alvarez and Marsal* report.  In order to substantiate the defendant's initial allegations against Principal Nadine Smith (that she faked an IMPACT observation), all the other defendants had to do would have been to conduct a 10 minute investigation in which students or co-teachers in the class time in question would be asked simply if anyone came into the class to observe the plaintiff or not.  However, no one did this.  Moreover, video evidence that would have vindicated the plaintiff was "lost, " according to Defendant Pinder.  There has been historical and institutional misconduct by DCPS administrators at Dunbar under Defendant Pinder's leadership that defendant has vehemently and actively fought against.

51.     Petitioner was at the forefront of exposing truths and conflicts when Dunbar High School was under the principalship of Abdullah Zaki III when it was alleged this former principal:

- Used IMPACT to get rid of teachers active in the WTU and/or opposed his policies and initiatives

- Violated several aspects of the CBA

- Illegally offered student a program of study in Twilight classes only, when their behavior could not be controlled in day classes and when the Twilight program was not up to standards to offer the requisite Carnegie Credits

- Under-reported suspensions

- Pressured teachers to change grades or pass students

- Tampered with attendance records -- including those of graduating seniors -- in order to comply with official policy that was previously enforced

52.     These findings gained traction in the independent agency *Marsel & Alvarez* report released 1/26/19, substantiating petitioner's claims about what had been happening on an illegal and immoral basis at Dunbar High School.

**53.**     Both Nadine Smith and Abdullah Zaki III were overseen by Superintendent Pinder, who did not want the exposure of illegal tampering of key school metrics by the Bad Acting principals under his guidance; therefore, Dr. Pinder opted to retaliate against the plaintiff by not previously granting any type of relief nor promise of belief as he is legally and contractually bound to do.

**54.**     Petitioner has also witnessed and fought against IMPACT ratings for his fellow teachers that included:

- Observations that were never conducted by an Assistant Principal who is still at Dunbar High School and this Assistant Principal purposefully misapplied grade policies to make Dunbar look like a higher performing institution that it actually is.

- Observations that were conducted on a former teacher, the day before this teacher took FMLA leave to care for a dying relative, in classes and subjects the teacher had never taught before

- Petitioner also has reported to Principal Nadine Smith, DC Central Office, and the Office of Inspector General specific instances of a fellow teacher who (originally during the Zaki principalship) fraudulently had higher performing students take standardized exams in place of lower performing students at the behest of the administration in order to make the school appear more high-performing than it really was (and so that certain benchmarks were made for administrators' own IMPACT scores).

- Given that DCPS and Dunbar administrators didn't want to confess to these bad acts, the Bad Actors chose to punish the plaintiff by faking his IMPACT score (to illegally separate plaintiff from his position) and to support the lie that everything was conducted above board with his evaluation.

**55.**   All of these factors above are tantamount to a clear and obvious example of retaliatory conduct under the D.C. Whistleblower Protection Act and under the Whistleblower Act 5 U.S.C. 2302(b)(8)-

Claims for Relief:

Claim Five:

**Conspiracy to Commit Fraud**

**56.** Plaintiff incorporates by reference the factual allegations in the forgoing paragraphs.

**57. Fed. R. Civ. P. 8(a)(2) statement:** Defendants Johnson, Pinder, Girard, Fuller, Barash, and Ferebee conspired to ensure that plaintiff was not granted relief from the faked-Smith IMPACT observation and from overall IMPACT manipulation that resulted in the illegal termination against the plaintiff.

**58.** A rigged score of 'ineffective,' comes with it the stigma that the plaintiff was supposedly terminated due to job performance.  However, plaintiff contends and will wish to present testimony from teachers and students that he was a popular and effective educator.  When you couple that with the fact that his allegations against Principal Smith were never properly investigated by Pinder, Girard, Fuller, Barash, and Ferebee, it naturally implies that a conspiracy was afoot.  Each defendant – and most likely others as well – either conspired to commit a fraudulent act or conspired to cover up such an act.  These acts are tantamount to breaking a criminal statute, DC Municipal Code § 22–3221: Fraud.

**59.** In any case, the standard for civil fraud can be met in this case: Plaintiff alleging fraud can prove by clear and convincing evidence (1) a false representation, (2) of a present, material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reasonable reliance by the party misled, and (6) resulting damage to him. See *Thompson v. Bacon*, 245 Va. 107, 111 (1993.).  Principal Nadine Smith's faked IMPACT observation, overall score machinations, and the cover up of the defendants can meet the criteria for a civil fraud case.

Claims for Relief:

Claim Six:

**Violation of the Fourteenth Amendment of the U.S. Constitution**

**60.** Plaintiff incorporates by reference the factual allegations in the forgoing paragraphs.

**61. Fed. R. Civ. P. 8(a)(2) statement:** Defendants' actions violate plaintiff's rights under the United States Constitution against deprivation of life, liberty, or property without due process.

**62.** No review of the facts would present any reasonable person to conclude the IMPACT rating assigned to the plaintiff was done legally.  Plaintiff has been denied equal protection under the law.  Plaintiff has a right – some may even say an obligation – to report bad deeds and to report the truth.

Claims for Relief:

Claim Seven:

**Violations of the National Labor Relations Act**

**63.** Plaintiff incorporates by reference the factual allegations in the forgoing paragraphs.

**64. Fed. R. Civ. P. 8(a)(2) statement:** petitioner asserts the collective action of Principal Smith and her administration, as well as the historical misconduct at Dunbar High School outlined previously, are unfair labor practices that injured the plaintiff as outlined in the National Labor Relations Act, specifically but not limited to § 8(a)(3).

## IV.  Prayer for Relief

The prayer for relief includes, but may not be limited to, the following:

<u>Monetary Damages</u>

A.  Compensatory Relief

Compensatory relief will be awarded to the plaintiff for any and all of the following, but not limited to:

i.   Plaintiff will be awarded the monetary value of employment from the time of illegal separation until resolution of the matter.  (Estimated to be $80,000 through December 2020)

ii.   Plaintiff will have restored all sick leave and other benefits he should have received, given a monetary value of all items (Estimated to be $10,000 through December 2020).

iii.   Plaintiff will be awarded an additional $12,000 to pay off student loans, which would have been forgiven under the Teacher Loan Forgiveness Program:  The Ford and FEEL programs would have forgiven student loans in exchange for continuous service in a high-needs school.  Plaintiff would have met those obligations had he not been illegally separated from his position by the Bad Actors of DCPS.

iv.   Plaintiff will be awarded $750 plus interest for remuneration in participation of the Georgetown Summer "Mi3" program.  Obligations of the program were not met to receive payment nor receive three graduate level credits because plaintiff needed to take the information from the program and present it to teachers in his fellow DCPS school, from which he was illegal separated.  A graduate credit hour in Georgetown is worth approximately $2225 (for a total of $6675 plus interest) at the time of this writing.  With the

stipend, the participant would have realized the equivalent of $7425 for the program).
Plaintiff participated in the program for 3 weeks, approximately 25 hours per week and
should be compensated for the time he could have used to do something else, given he
should never have been illegally separated (an additional $3075).

v.     Plaintiff shall be awarded additional time or money to earn PLUs or credits towards renewal
of his teaching license that he would have normally enjoyed during the regular course of
employment, but for being illegally separated.  The cost of such a restorative program to the
plaintiff would be approximately $3500 through December 2020.

vi.    Plaintiff should have been given the opportunity to teach summer school or the Extended
School Year Program, as he had done in the past, with expected earnings of $6,000.  He was
robbed of a chance to teach two summers for DCPS for a total of $12,000.

vii.   Plaintiff should have been given the opportunity to work in 'Twilight Program' in the 2019-
2020 school year as he had regularly done in the past at Dunbar, but for the fact he was
illegally separated.  The cost of this disservice to the plaintiff is valued at approximately
$20,000.  Given plaintiff was illegally denied working the 'Twilight' program in 2016-17 as
part of a retaliatory effort, an additional $20,000 is summed to $40,000.

viii.  Plaintiff should have been given paid time off or FMLA to deal with urgent family matters,
including a death in the family, but had to endure the harshness without benefits.  Putting a
dollar figure on something as important as this is difficult; a figure of $50,000 will be used.

ix.    Plaintiff has been subjected to intentional infliction of emotional stress by defendants'
actions – particularly those of Principal Nadine Smith for which his last name was slurred
and for which he was libeled in public forums.   In addition, the plaintiff has been subjected
to the negligent infliction of emotional stress and has been burdened by both physical and

mental strains.  Plaintiff was undergoing dental treatment but because coverage suddenly and illegally stopped, he lost two teeth that were undergoing treatment.  Replacement costs are estimated to be $30,000.  Furthermore, due to illegal loss of job, plaintiff had no healthcare (during a pandemic); had to buy one's own medical supplies usually covered by insurance; had uncertainty about the future; depression; and, lack of belief that those in power will do the right thing.  Plaintiff claims that he was targeted early in the 2018-19 school year to be retaliated against and has lived with intense stress since then.  Such events are worth an approximate $200,000 to the plaintiff.

x.    Plaintiff would have ordinarily had money to pay bills; rather, he accumulated additional interest and penalties on accounts he would normally have been able to pay but for the illegal separation from DCPS.  The value of these accounts – estimated from July 2019 through December 2020 – are approximately an additional $15,000.  This figure includes interest on a loan taken out to help defray the cost of essential bills and purchases without an income.

xi.    Plaintiff had to relinquish his apartment in Southwest DC where he enjoyed easy access to nearby amenities because he could no longer afford the rent after (shockingly) being illegally separated from his job when he should not have been.  Defendants will be responsible for costs associated with plaintiff moving and plaintiff putting items in storage (approximately $6500 estimated through December 2020).  Defendants will be responsible for costs associated with moving back to and securing an area and space comparable to what he enjoyed before he was illegally separated, for an approximate dollar value of $7500.

xii.    Plaintiff has lost out on FMLA accounts and transportation savings for approximately $2000 through December 2020 had he not been illegally separated.

xiii.   All court and legal costs shall be borne by the defendants (estimated to be $3500 as of
        December 2020)

xiv.    Time, money, and effort for job search by the plaintiff when there should have been no need
        to totals to approximately $1500 to date.

xv.     Vacation planned in February 2019 during a winter resulted in approximately $1500 in
        cancellation fees that were necessary.  Had the plaintiff not been illegally terminated, he
        would have carried through with those plans.

xvi.    Plaintiff accrued approximately $500 in costs testifying before DC City Council in February
        2019 taking 6 hours out of his day to be in chambers in person and copying relevant
        documents for all Council Members to view.

   1.   Compensatory Totals are approximately $484,500 estimating out to
        December 2020.

B.  Punitive Damages

   i.   Given the defendants' conduct was clearly malicious, oppressive, and reckless in regards to
        plaintiff's rights, the court is asked to award punitive damages against the actors.

        1.  The punitive damages shall be three times the amount of compensatory
            damages, for a figure of approximately $1,453,500.

            a.  The total monetary award to the plaintiff (compensatory and punitive)
                is estimated to be $1,938,000 through December 2020.

<u>Specific Performance</u>

C. Investigatory Relief:

Appointment of an independent agency outside of DC Public Schools to investigate a multitude of claims and issues brought forth by the plaintiff, including but not limited to:

i.   The falsification of IMPACT scores by Principal Nadine Smith and the institutional cover up that proceeded it.  Such an outside agency will also focus on the lies told by Principal Nadine Smith on more than one occasion in her official public capacity and in official public forums to the detriment of the plaintiff.  Upon completion of such an investigation, any offending parties to the origination or perpetuation of the falsehoods told by Principal Nadine Smith will face:

- Termination from DCPS
- Revocation of teaching and/or administrative licenses
- Fines in the amount of:
    o   $250,000 for Dr. Ferebee
    o   $300,000 for Dr. Pinder
    o   $350,000 for Principal Nadine Smith
    o   $100,000 for Jade Fuller
    o   $100,000 for Kaitlyn Girard
    o   $100,000 for Errol Johnson

ii.  How DCPS is able to manipulate IMPACT scores unfairly for retaliatory purposes and the extent at which it has occurred in the last 5 years.  Upon completion of such an investigation, a declaratory judgement against the defendants whereby IMPACT is deemed illegal.  As an

alternative to the demolition of IMPACT, this court will monitor DCPS's use of the IMPACT.

iii.   An outing of school personnel that have altered, coerced, harassed, or intimidated teachers, students, or other administrators to change or manipulate official records, with subsequent termination of the offending parties.

C.  IMPACT or evaluative relief

i.   Removal of all IMPACT scores from the 2018-19 school year with an automatic increase in STEP would be outlined in the LIFT documents by an appropriate rating of 'No Consequence'; 'Effective'; or 'Highly Effective.'

ii.   Declaratory Judgement of an 'Effective' rating for the 2016-17 school year, since no final hearing on the substantive issues raised have been granted by DC Public Schools.

iii.   For all remaining and new administrators at Dunbar to be trained on how to effectively use IMPACT as overseen by the court.

iv.   For Principal Nadine Smith to be barred from IMPACTing any DC Public School Teacher from here on in.

v.   Given the outrageous conduct DCPS has employed over the years, for plaintiff to be immune from any and all official DCPS evaluations, unless he so chooses to waive that right.  The plaintiff will enjoy all regularly scheduled promotions and increases in salary for an automatic LIFT (or other evaluative system) position.

    vi.    To DCPS to establish and activate concrete measures so that no single staff member is targeted by local administration at Dunbar or any other school.  Such measures will be monitored by the court.

    vii.    For DCPS to expeditiously review all outstanding grievances pertaining to Stephen Grivnow, rather than keeping them indefinitely at the grievance process

D.  Vacation Specific Perfomance

    i.    To make up for the lost vacation in February 2019, a similar week long vacation will be granted within a year that the plaintiff is reinstated with no vacation penalty.

E.  To be "made whole" and treated with respect

    i.    For an official apology to be written by the defendants to the plaintiff and shared with the entirety of the DC Public School System and all stakeholders at Dunbar High School in the form of an email detailing what was illegally done to the plaintiff and what measures will be in place to make sure no overstepping of authority via IMPACT or other evaluative system is ever again perpetuated by DCPS agents against any teacher.

    ii.    For DCPS to award plaintiff regular LIFT promotions and increases in salary from the time of illegal separation until this matter is resolved.

    iii.    Plaintiff will be given an opportunity to make contributions to retirement plans that he would have otherwise had an opportunity to invest in.  Plaintiff will accrue additional time from the illegal separation to be vested in the 401(a) retirement / pension plan.  Plaintiff will be given an opportunity to update his banking profile and other demographic information in Peoplesoft before a judgement amount is paid out.

iv.　Placement and Time Frame Upon Return to Work:  Plaintiff will be given a minimum of 2 months' notice upon a return to work order to find housing and move closer to the District of Columbia.  Plaintiff will be placed in the exact same school (Dunbar High School) where he previously taught, unless he voluntarily waives such a condition of his re-employment. Plaintiff enjoys the convenience and distance to travel to Dunbar via public transport or via bike; plaintiff enjoys cultivating relationships with new and familiar Dunbar families; and plaintiff enjoys a sense of pride at the scholastic institution that is Dunbar, the first African-American public high school in the United States.  He has proudly worn Dunbar apparel and interacts pleasantly and collaboratively with all Good Actors at the school for the benefit of the students.  Plaintiff feels that any placement other than Dunbar or other institution approved by him is tantamount to additional injury.

v.　DCPS will put in measures to transform Dunbar High School into a high-quality institution, with Supervisors who are morally upstanding with a desire to eliminate unfair, unlawful, corrupt, and retaliatory practices and scandalous activities that hurt District of Columbia Public Schools children and their families.  Such efforts will be aimed at restoring the stakeholders of Administration and Teachers to a "full and equal partnership" under § 2.1 of the Collective Bargaining Agreement with the Washington Teachers Union.

**F.** Special Relief for Additional Injured Party

i.　Defendants will contribute a startup of $5,000 towards a Dunbar youth and staff dragon boat team for the enjoyment, recreation, and sport of dragon boating managed by the plaintiff under the auspices of the D.C. Dragonboat Club as Dunbar students and staff were robbed of

opportunities to learn, grow, and work as a team had the fix not been on to illegally tamper with plaintiff's IMPACT score, further coverup, and illegal separation.

ii.     Each year in March, DCPS will contribute an inflation-adjusted $2,500 towards the costs of the Dunbar Dragonboat team.  It will be administered to the plaintiff under the auspices of the DC Dragonboat Club.

## V.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.     For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing            _____

Signature of Plaintiff     _____

Printed Name of Plaintiff  _____