UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STEPHEN K. GRIVNOW**, <br><br>            Plaintiff, <br><br>            v. <br><br> **MURIEL BOWSER, et al.**, <br><br>            Defendants. | Case No. 20-cv-2000 (CRC) |

## MEMORANDUM OPINION

Former District of Columbia Public Schools ("DCPS") teacher Stephen K. Grivnow brings this *pro se* lawsuit against D.C. Mayor Muriel Bowser and various DCPS officials. In July 2019, Grivnow was discharged from his position at Dunbar High School following a poor performance evaluation. He alleges that the evaluation and resulting termination violated the Fifth Amendment's Due Process Clause and a host of D.C. and federal laws. The defendants move to dismiss Grivnow's complaint. As explained below, the Court finds that virtually all of Grivnow's claims either are time barred, fall within the exclusive jurisdiction of the D.C. Public Employee Relations Board, or fail to state a claim. There is one exception, however: Grivnow has (just barely) pled a valid claim for retaliation under the D.C. Whistleblower Protection Act. The Court will therefore deny the motion to dismiss as to a portion of that claim, and grant it in all other respects.

**I.  Background**

Before his termination, Grivnow taught math at Dunbar High School. Second Am. Compl. ¶ 1, ECF No. 36-1 (hereinafter "Compl.").[1] Grivnow characterizes himself as an

---

[1] Grivnow filed this complaint on July 17, 2020. See ECF No. 1. After resolving issues with service of process, Grivnow filed an amended complaint. See First Am. Compl. ECF No.

outspoken member of the Washington Teacher's Union ("WTU") who regularly reported "fraud, abuse, [and] contract violations" at the school. Id. ¶ 2. In particular, Grivnow alleges that in 2018 he exposed record keeping violations regarding student attendance at Dunbar to an independent auditor, Alvarez & Marsal, that had been engaged by the District's Office of the State Superintendent of Education to examine policy adherence and graduation rates in DCPS high schools. Compl., Ex. A-1 (Alvarez & Marsal Report), ECF No. 36-2. Grivnow claims that Dunbar Principal Nadine Smith gave him an artificially low "IMPACT" teacher evaluation score and then terminated him in retaliation for this whistleblowing. Compl. ¶¶ 3, 6. He further alleges that Principal Smith fabricated her assessment of his classroom teaching—which is part of the IMPACT process—despite not having observed him in the classroom. Id. ¶ 10. And, he claims that the various other DCPS administrators named in his complaint "conspired" with Principal Smith to "support" her supposed fabrication of his IMPACT score. Id. ¶ 16.

Grivnow also generally complains of widespread abuse of DCPS's IMPACT evaluation system and its negative effect on teachers and students more broadly. See id. ¶ 4 ("IMPACT has been criticized as creating a culture of fear amongst staff and has been criticized as creating an impetus to make statistics look good for school administrators at the expense of the students' educational needs."); id. ¶ 35 (alleging high teacher turnover rate due to IMPACT policies); id. ¶ 61 (alleging Dunbar's former principal "[u]sed IMPACT to get rid of teachers active in the WTU"). Grivnow filed numerous union grievances concerning IMPACT policy violations he claimed to have observed, as well as grievances about his own IMPACT evaluation. Id. ¶ 59; see

---

19 (March 30, 2021). The defendants moved to dismiss. Following a number of briefing extensions requested by both parties, the Court held a status conference, during which Grivnow moved for leave to amend his complaint a second time. See Minute Order (July 14, 2021); Mot. for Leave to Amend, ECF No. 36. The Court granted that motion, so Grivnow's Second Amended Complaint is now the operative pleading.

also id., Ex. C-1.  Grivnow names eight separate defendants: (1) Mayor Muriel Bowser, (2) DCPS Chancellor Dr. Lewis Ferebee, (3) DCPS Chief of Labor Management Kaitlyn Girard, (4) DCPS Labor Management and Employee Relations Manager Jade Fuller, (5) DCPS General Counsel D. Scott Barash, (6) David Pinder, Superintendent for one of DCPS's geographic subdivisions; (7) Dunbar Principal Nadine Smith, and (8) Dunbar Assistant Principal Errol Johnson.  Compl. at 4.

The complaint asserts seven causes of action against all defendants.  They include a constitutional claim under the Due Process Clause (claim 1); statutory claims under the D.C. and Federal Whistleblower Protection Acts (claim 4), the D.C. Administrative Procedure Act (claim 6), and the National Labor Relations Act (claim 7); and common law claims for breach of the WTU's collective bargaining agreement (claim 2), defamation (claim 3), and conspiracy to commit fraud (claim 5).  Compl. ¶¶ 47–79 (Claims for Relief).  The defendants move to dismiss the complaint in its entirety for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  See Defs.' Mot. to Dismiss at 1, ECF No. 39.  The motion is ripe for the Court's consideration.

## II.   Legal Standards

Rule 12(b)(6) requires dismissal of a complaint that fails "to state a claim upon which relief can be granted."  When evaluating a 12(b)(6) motion, the court must determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

3

Under the standard set forth in Twombly, a "court deciding a motion to dismiss" must "assume all the allegations in the complaint are true (even if doubtful in fact)" and "must give the plaintiff 'the benefit of all reasonable inferences derived from the facts alleged.'" Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc., 525 F.3d 8, 17 (D.C. Cir. 2008) (first quoting Twombly, 550 U.S. at 555; and then quoting Stewart v. Nat'l Educ. Ass'n, 471 F.3d 169, 173 (D.C. Cir. 2006)). Although a complaint need not provide "detailed factual allegations" to withstand a Rule 12(b)(6) motion, it must offer "more than labels and conclusions." Twombly, 550 U.S. at 555. "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." Stewart, 471 F.3d at 173.

"A document filed *pro se* is 'to be liberally construed,'" and "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Yet, *pro se* complaints must still "plead factual matter that permits the court to infer more than the mere possibility of misconduct," Abdelfattah v. U.S. Dep't of Homeland Sec., 787 F.3d 524, 533 (D.C. Cir. 2015) (quoting Jones v. Horne, 634 F.3d 588, 596 (D.C. Cir. 2011)), and "present a claim on which the Court can grant relief," Smith v. Scalia, 44 F. Supp. 3d 28, 36 (D.D.C. 2014) (quoting Budik v. Dartmouth-Hitchcock Med. Ctr., 937 F. Supp. 2d 5, 11 (D.D.C. 2013)).

**III. Analysis**

The District offers three arguments for dismissal. First, it contends that Grivnow's allegations against the individual DCPS administrators are overly conclusory and lack factual support. Second, it argues that the D.C. Comprehensive Merit Personnel Act vests exclusive

jurisdiction over Grivnow's state and common law claims with the District's Public Employee Relations Board.  Finally, the District maintains that Grivnow has failed to state a constitutional claim. The Court takes each in turn.

    A.  <u>Individual Defendants</u>

Grivnow has sued the individual D.C. and DCPS officials in both their official and personal capacities.  Compl. at 3 (Parties).  To the extent that Grivnow sues defendants in their official capacities, the Court will construe these claims as brought against the District of Columbia.  "It is well-established that '[w]hen sued in their official capacities, government officials are not personally liable for damages.'"  <u>Younger v. D.C. Pub. Sch.</u>, 60 F. Supp. 3d 130, 142 (D.D.C. 2014) (alteration in original) (quoting <u>Atchinson v. District of Columbia</u>, 73 F.3d 418, 424 (D.C. Cir. 1996)).  "A suit for damages against municipal officials in their official capacities 'is thus equivalent to a suit against the municipality itself.'"  <u>Id.</u> (quoting <u>Atchinson</u>, 73 F.3d at 424); <u>see</u> <u>Price v. D.C.</u>, 545 F. Supp. 2d 89, 94 (D.D.C. 2008) ("[T]he complaint names the mayor as a defendant in his official capacity only, which is equivalent of suing the city." (quoting <u>Jungels v. Pierce</u>, 825 F.2d 1127, 1129 (7th Cir. 1987)); <u>see also</u> D.C. Code § 1–615.54 (providing that a D.C. Whistleblower Protection Act claim may be brought "against the District, and, in his or her personal capacity, any District employee, supervisor, or official having personal involvement in the prohibited personnel action").  Accordingly, the Court will construe Grivnow's claims against the defendants in their official capacities as claims brought against the District of Columbia and direct the Clerk's Office to add the District of Columbia to the caption of this case.  <u>See, e.g.</u>, <u>Proctor v. District of Columbia</u>, 74 F. Supp. 3d 436, 445 n.3 (D.D.C. 2014) (substituting the District as defendant in place of DCPS administrators named in their official capacity); <u>Miller v. Gray</u>, 52 F. Supp. 3d 62, 66–67 (D.D.C. 2014) (substituting the

District as defendant in place of mayor sued in official capacity); Henneghan v. D.C. Pub. Schools, 597 F. Supp. 2d 34, 37 (D.D.C. 2009).

Turning to Grivnow's claims against the individual defendants based on their personal involvement in the relevant personnel actions, aside from those concerning Principal Smith, Grivnow's allegations fall short of the pleading standard set forth in Twombly and Iqbal. As discussed more below, Grivnow alleges that Principal Smith gave him an artificially deflated IMPACT score and eventually terminated him in retaliation for his whistleblowing activities. See Compl. ¶¶ 3, 6, 58–60. But with respect to the other individual defendants, Grivnow has failed to allege any facts that would give rise to personal liability. Rather, he alleges merely that they "supported" Principal Smith's attempt to punish him for his union activity, or that they knew about the "evidence" against her and did nothing. See e.g., Compl. ¶ 5 ("Defendants Pinder, Girard, Fuller, Barash, and Ferebee all had the chance to grant plaintiff relief and did not."); Compl. ¶ 34 (Grivnow claims to have contacted Mayor Bowser's office with evidence about "what was going on" but "after a while all communication stopped from the mayor's side."). Those allegations fail to state valid claims. The following defendants are thus entitled to dismissal from this suit: Mayor Bowser, Lewis Ferebee, Kaitlyn Girard, Jade Fuller, D. Scott Barash, David Pinder, and Errol Johnson.[2]

---

[2] Grivnow alleges that Pinder failed to investigate adequately his grievance challenging his low IMPACT score and that Johnson did not permit him to review his Teacher-Assessed Student Achievement Data score, which contributed to his low IMPACT score. Compl. ¶¶ 17, 38; see also Ex. A-1, ECF No. 36-2, at B-1. These claims do not appear to allege actionable conduct, but to the extent that they do, they concern work-related complaints falling under the exclusive jurisdiction of the PERB. See infra at 7–9.

6

B.  <u>Public Employee Relations Board Jurisdiction</u>

The Comprehensive Merit Personnel Act ("CMPA"), D.C. Code §§ 1–601.01 <u>et seq</u>, created a merit personnel system for handling employee grievances in the District of Columbia. <u>Burton v. District of Columbia</u>, 835 A.2d 1076, 1078 n.2 (D.C. 2003). "With few exceptions, the CMPA is the exclusive remedy for a District of Columbia public employee who has a work-related complaint of any kind." <u>Robinson v. District of Columbia</u>, 748 A.2d 409, 411 (D.C. 2000). The CMPA was "'plainly intended' to 'create a mechanism for addressing virtually every conceivable personnel issue among the District, its employees, and their unions—with a reviewing role for the courts as a last resort, not a supplementary role for the courts as an alternative forum.'" <u>Younger</u>, 60 F. Supp. 3d at 139 (quoting <u>McManus v. District of Columbia</u>, 530 F. Supp. 2d 46, 77 (D.D.C. 2007)).

The CMPA thus requires District employees to present a wide swath of workplace grievances to an administrative body called the Public Employee Relations Board, or "PERB." <u>Younger</u>, 60 F. Supp. 3d at 142 ("[A]ll claims arising out of the employment relationship between the District of Columbia and its employees fall within the exclusive jurisdiction of PERB."). It also establishes several layers of administrative appeals that DCPS employees must pursue following adverse decisions by the PERB. <u>See</u> Mot. at 11–12 (noting that, after appealing to the Chancellor's Impartial Review Board, an aggrieved teacher can appeal his termination to the D.C. Office of Employee Appeals ("OEA")); <u>see also</u> <u>Sharma v. District of Columbia</u>, 791 F. Supp. 2d 207, 215 (D.D.C. 2011) ("Under the CMPA, an employee must exhaust the applicable administrative procedures before pursuing judicial remedies," which include "first bring[ing] their challenge to the OEA, and . . . thereafter appeal[ing] any adverse decision to the D.C. Superior Court and thereafter to the District of Columbia Court of Appeals."). And the CMPA

vests judicial review of administratively exhausted grievances exclusively with the local courts of the District of Columbia. D.C. Code § 1-606.03(d).

Grivnow does not allege that he exhausted this comprehensive administrative process with respect to his IMPACT evaluation or termination. To the contrary, he admits he jettisoned the process after the first-level administrative appeal. Pl.'s Opp'n at 12, 16 (Grivnow appealed to the Chancellor but never appealed his termination either the OEA or the D.C. Superior Court). And even if he had exhausted all avenues of administrate review, he seeks initial judicial review in this court rather than D.C. Superior Court as the CMPA requires. See McManus, 530 F. Supp. 2d at 77–78 ("District employees must pursue adverse actions before the OEA and then in Superior Court, and must pursue workers' compensation claims before [the Department of Employment Services] and then in the District of Columbia Court of Appeals.").

Accordingly, this Court lacks jurisdiction over any of Grivnow's claims that the CMPA required him to pursue via the PERB. Those claims include Grivnow's second cause of action alleging a breach of the WTU's collective bargaining agreement. D.C. Code § 1-617.02(b)(2); see Wilson v. District of Columbia, 608 A.2d 161, 161 (D.C. 1992) (per curiam) (CMPA precludes action alleging breach of collective bargaining agreement). Grivnow's seventh claim, alleging violations of the National Labor Relations Act, meets the same fate. The PERB, not the National Labor Relations Board, oversees the resolution of unfair labor practice allegations for District workers. D.C. Code § 1-617.02(b)(2); see also Stockard v. Moss, 706 A.2d 561, 564 (D.C. 1997). And the PERB has "primary jurisdiction to determine whether a particular act or omission constitutes an unfair labor practice under the CMPA." Battle v. District of Columbia, 80 A.3d 1036, 1038 (D.C. 2013). The Court therefore must dismiss claims two and seven of Grivnow's complaint as well.

For similar reasons, the Court also lacks jurisdiction over Grivnow's common law claims arising from his employment relationship with DCPS. "A litigant cannot bypass PERB's jurisdiction by bringing the same action as a common law claim." McManus, 530 F. Supp. 2d at 78 (quoting Cooper v. AFSCME, Local 1033, 656 A.2d 1141, 1144 (D.C. 1995)); see also Feaster v. Vance, 832 A.2d 1277, 1283 (D.C. 2003) ("[A] plaintiff cannot 'bypass' the Board by arguing that the complaint also asserts a common law cause of action such as breach of contract."). The Court therefore lacks jurisdiction to consider Grivnow's claims for fraud and defamation, both of which arise from his employment relationship with the District. See Younger, 60 F. Supp. 3d at 142 ("[Plaintiff's] common law claims, *i.e.*, breach of contract, breach of the covenant of good faith and fair dealing, and defamation, are based on DCPS's actions as her employer, and therefore fall within PERB's exclusive jurisdiction."); Owens v. District of Columbia, 631 F. Supp. 2d 48, 56 (D.D.C. 2009) (defamation claims relating to the reasons for a plaintiff's termination are subject to the CMPA's administrative exhaustion requirement). Accordingly, the Court must dismiss those claims as well.

Finally, Grivnow claims the IMPACT process violates the D.C. Administrative Procedure Act ("APA"), D.C. Code § 2-510(a). But the D.C. APA "places exclusive jurisdiction in the D.C. Court of Appeals" to review any challenges to a District agency's action. Lightfoot v. District of Columbia, 448 F.3d 392, 399 (D.C. 2006). This Court therefore cannot hear Grivnow's challenge under the D.C. APA, and must dismiss that claim, too.

### C. Whistleblower Protection Act Claim

Grivnow's fourth claim is for retaliation under both the Federal Whistleblower Protection Act ("FWPA") and the D.C. Whistleblower Protection Act ("DCWPA"). Although Grivnow's FWPA claim fails, he has plausibly alleged a claim under the DCWPA.

The FWPA "provides most federal agency employees with protection against agency reprisals for whistleblowing activity, such as disclosing illegal conduct, gross mismanagement, gross wasting of funds, or actions presenting substantial dangers to health and safety." Stella v. Mineta, 284 F.3d 135, 142 (D.C. Cir. 2002); see 5 U.S.C. § 2302(b)(8).  But, by its own terms, the FWPA "applies only to federal employees." Bilal-Edwards v. United Planning Org., 896 F. Supp. 88, 93 n.8 (D.D.C. 2012); see 5 U.S.C. § 2105(a) (defining an "employee" for purposes of the FWPA as an employee of the federal government).  Because Grivnow, as a DCPS teacher, does not allege that he was an employee of the federal government, the FWPA does not apply to him.  Compl. ¶ 1.  His FWPA claim must therefore be dismissed.

Grivnow's retaliation claim under the DCWPA fares better.  To state a prima facie claim under the DCWPA, a plaintiff must "establish[] that she made a protected disclosure, that a supervisor retaliated or took or threatened to take a prohibited personnel action against her, and that her protected disclosure was a contributing factor to the retaliation or prohibited personnel action." Wilburn v. District of Columbia, 957 A.2d 921, 924 (D.C. 2008).

Grivnow alleges that he provided information about attendance violations at Dunbar to an Alvarez & Marsal investigator sometime before January 26, 2018.[3]  Compl. ¶ 21; see also Ex. B-1, ECF No. 36-3 (purported email between Alvarez & Marsal investigator and Grivnow). Grivnow also claims that DCPS administrators learned that he was a whistleblower on January 31, 2018, a few days after the Alvarez & Marsal report was published.  Compl. ¶ 22.  Finally, he alleges Principal Smith intentionally gave him a low IMPACT score, and later terminated him, in retaliation for his filing union grievances and for reporting information to the Alvarez & Marsal

---

[3] The complaint states that the Alvarez & Marsal report was released on January 26, 2019, but the report itself, attached as an exhibit to the complaint, shows that it was published on January 26, 2018.  See Compl. Ex. A-1, ECF No. 36-2.

investigators. Compl. ¶¶ 56–69. While a close call, taking these factual allegations as true, the Court finds that at least part of Grivnow's DCWPA claim may proceed.

The District argues that Grivnow's DCWPA claim falls within the CMPA because it is, in essence, an unfair labor practice claim. Mot. at 20–21. As described above, the CMPA gives the PERB exclusive authority over unfair-labor-practice claims brought by D.C. government employees. Hawkins v. Hall, 537 A.2d 571, 574–75 (D.C. 1988). But the DCWPA serves a somewhat different purpose and creates different remedies. The DCWPA was passed to "[e]nhance the rights of District employees to challenge the actions or failures of their agencies" and to "[p]rovide new rights and remedies" to employees. D.C. Code § 1–615.51(1), (3); see also Sharma, 791 F. Supp. 2d at 216. To that end, the DCWPA expressly provides that an aggrieved employee "may bring a civil action against the District," D.C. Code § 1–615.54, and may pursue such an action even without pursuing an "administrative remedy for the same cause of action from the Office of Employee Appeals," id. § 1–615.56(a) (stating that the initiation of a civil action under the DCWPA precludes an employee from pursuing administrative remedies with OEA). Multiple courts in this district have therefore held that DCWPA claims are not subject to CMPA preemption. Sharma, 791 F. Supp. 2d at 216; see also Baumann v. District of Columbia, 933 F. Supp. 2d 19, 28 (D.D.C. 2013) ("[T]he CMPA does not pre-empt the Plaintiff's Whistleblower Protection Act claims"); see also D.C. Code § 1–615.56(a). Accordingly, Grivnow's claim under the DCWPA is not automatically foreclosed by the CMPA.

The claim is not out of the woods yet, however. Grivnow alleges retaliation on two grounds: (1) for his "filing of union grievances" and (2) for his "co-operation with the Alvarez and Marsal report in January 2018 that led to the public disclosure of falsifying school attendance records." Compl. ¶ 57. The Court agrees with the District that the first part of this

11

claim—retaliation for filing union grievances—constitutes an unfair labor practice claim that must be brought before the PERB.  Mot. at 20–23; see also Compl., Ex. C-1 at 2 (stating that discipline or retaliation against a teacher on the basis of association with the WTU violates Article 3 of the CBA).  The Court also concurs that Grivnow's complaints about the efficacy of the IMPACT process are not protected disclosures under the WPA.  See Hawkins v. Boone, 786 F. Supp. 2d 328, 333 (D.D.C. 2011) ("[A]n ongoing policy debate did not constitute a 'disclosure' as required under the WPA.").  Accordingly, the Court has jurisdiction over only a narrow portion of Grivnow's DCWPA claim:  retaliation based on his disclosures of specific, unknown wrongdoing to an Alvarez & Marsal investigator and to the D.C. Office of Inspector General, both of which are alleged in his complaint.  See Compl. ¶¶ 21, 64.[4]  The Court does not have jurisdiction over any claim of retaliation based on Grivnow's union grievances, union participation, or complaints about IMPACT generally, as these types of claims must be brought before the PERB in the first instance.

The District next argues Grivnow's DCWPA claim is outside the applicable statute of limitations.  The relevant DCWPA limitations period here is within one year after the employee first becomes aware of the violation.  See Sharma, 791 F. Supp. 2d at 212.  The District maintains that, because Grivnow's termination on July 19, 2019 "flowed" from his low IMPACT score on April 10, 2019, his July 17, 2020 complaint—filed more than a year after his IMPACT score—is untimely.  Mot. at 25.

---

[4] The Court takes no view at this stage whether Grivnow's disclosures meet the DCWPA's definition of a "protected disclosure," D.C. Code § 1–615.53, or whether the Alvarez & Marsal auditor constitutes a "public body" to which a disclosure must be made, id. § 1–615.52(a)(7)(D).  The District did not raise either issue.

12

The District is mistaken. A "discrete retaliatory or discriminatory act occurred on the day that it happened," and "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." Natl. R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (interpreting Title VII). Grivnow alleges that both his IMPACT score and his termination were done in retaliation for his whistleblowing. See Compl. ¶ 60 (alleging the defendants wanted to "get rid of plaintiff . . . due to his past participation in union activities and his participation in the Alvarez & Marsal report"). Thus, his complaint is fairly understood as alleging two separate acts of retaliation—the IMPACT evaluation on April 10, 2019, which is outside the limitations period, and his termination on July 19, 2019, which is within it.

The District makes an additional argument based on the timing of Grivnow's alleged whistleblowing: that there is insufficient temporal proximity between any protected disclosures and his termination over a year later to support an inference of causation. Mot. at 20. Grivnow alleges that DCPS administrators learned of his whistleblowing no later than January 31, 2018. Compl. ¶ 22. His negative performance evaluation—delivered in two "cycles"—occurred on November 2018 and April 2019. Compl., Ex. C-1 at 4–7. Most generously, then, there was a ten-month period between the date Grivnow's supervisors allegedly learned of his whistleblowing and the earliest date he received a negative IMPACT score. This is typically not a close enough temporal connection to support a prima facie retaliation claim, absent further allegations. See Payne v. District of Columbia, 722 F.3d 345, 354 (2013) ("Once the time between a protected disclosure and a negative employment action has stretched to two-thirds of a year, there is no 'temporal proximity' to support a causal connection between the two, nothing else appearing."); Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (per curiam) ("[C]ases that accept mere temporal proximity between an employer's knowledge of protected

activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" (quoting O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001))).

However, "[a] large gap between protected activity and retaliation is not necessarily fatal to a claim when the plaintiff can point to other factors leading to an inference of causation." Greer v. Bd. of Trs. of Univ. of D.C., 113 F. Supp. 3d 297, 311 (D.D.C. 2015). Here, arguably at least, there is another factor: Grivnow alleges that Principal Smith directed a slur at him—calling him "Mr. Grieve-no"—during a school meeting, purportedly evincing her hostility towards him based on his protected complaints. Compl. ¶ 28.[5] He also alleges that Principal Smith had an incentive to terminate him because his grievances would have reflected poorly on her as the principal. Compl. ¶ 60. Grivnow's complaint therefore provides more detailed factual allegations than those which rely on temporal proximity alone to establish causation. See, e.g., Stanton v. Potomac Elec. Power Co., No. 20-cv-02464 (CRC), 2021 WL 4192149, at *10 (D.D.C. Sept. 15, 2021). Although perhaps weak evidence of retaliatory motive, Grivnow's allegations—the timing of his disclosures, the comment made by Principal Smith, and the fact that Smith was also the decisionmaker who allegedly lowered Grivnow's IMPACT score—just barely pass the plausibility threshold. Taken together and drawing all possible inferences in

---

[5] The Court takes no position on whether Principal Smith actually made this comment or in fact felt any hostility towards Grivnow. Whether the comment was made at the meeting will have to be resolved at summary judgment. At this stage, the Court must take Grivnow's allegations as true and give him "the benefit of all reasonable inferences from the facts alleged." Aktieselskabet, 525 F.3d at 17. Summary judgment is the appropriate stage to resolve this and similar factual disputes, including whether any of the information Grivnow disclosed was already known to the public. See Baumann v. District of Columbia, 795 F.3d 209, 214 (D.C. Cir. 2015) (resolving DCWPA claim at summary judgment); Nunnally v. District of Columbia, 243 F. Supp. 3d 55, 72 (D.D.C. 2017) (granting in part and denying in part summary judgment on plaintiff's DCWPA retaliation claim); Younger, 60 F. Supp. 3d at 143 (finding that decision on teacher's claims of age discrimination and retaliation must await fact discovery).

Grivnow's favor, these allegations are enough to "nudge[]" his narrowed DCWPA claim "across the line from conceivable to plausible." Twombly, 550 U.S. at 570. The Court will therefore deny defendants' motion to dismiss as to this claim. It must be tested further at the summary judgment stage.

### D. Due Process Claim

Finally, Grivnow claims his termination violated the Due Process Clause of the Fifth Amendment, though it is unclear precisely what kind of due process right he claims the defendants violated. First, he says he was "denied equal protection" because of his status as a whistleblower and educational advocate. Second, he suggests that his IMPACT review process was inadequate because the reviewers and other participants were biased. Compl. ¶¶ 47–51 (citing Goldberg v. Kelly, 397 U.S. 254 (1970)). Though not particularly well articulated or explained in detail, the Court understands Grivnow to be asserting both an equal protection claim and a procedural due process claim. The Court takes each in turn.

Grivnow has not stated a claim under the equal protection component of the Due Process Clause. "There are generally two means by which a plaintiff can allege an equal protection violation." Kelley v. District of Columbia, 893 F. Supp. 2d 115, 122 (D.D.C. 2012). First, an individual may claim "that he or she received differential treatment by the government due to membership in a protected class, such as one based on race, national origin, or gender." Id. Alternatively, "if an individual is not a member of a protected class" but alleges that he was "arbitrarily and intentionally treated differently from others who are similarly situated" with no rational basis to support the difference in treatment, "the individual may qualify as a 'class of one' and be entitled to pursue an equal protection claim" on that basis. Id. (quoting Vill. Of Willowbrook v. Olech, 528 U.S. 562, 564–65 (2000)).

Here, Grivnow does not allege that he was treated differently due to membership in a protected class, such as race, national origin, gender, or the like. Rather, he alleges only that he was denied equal protection "because of his status as a whistleblower and because of his status as an educational advocate." Compl. ¶ 50. The Court will therefore assess Grivnow's equal protection claim under the framework governing "class of one" claims. See Kelley, 893 F. Supp. 2d at 122 (analyzing under the "class of one" rubric a claim based on plaintiffs' status as "officers who were subjected to illegal conduct, whose terminations were recently overturned by arbitrators, who were ordered back to work and made whole, and who were deprived of a property interest in the form of their jobs").

An essential element for a class of one equal protection claim is "the existence of similarly situated but differently treated parties." Lillemoe v. United States Dep't of Agric., Foreign Agric. Serv., 344 F. Supp. 3d 215, 228 (D.D.C. 2018); see also 3883 Connecticut LLC v. District of Columbia, 336 F.3d 1068, 1075 (D.C. Cir. 2003) (the "two essential elements" of a "class of one" equal protection claim are: "(1) disparate treatment of similarly situated parties (2) on no rational basis"). This element is "not a mere formality" but rather "serves to distinguish claims to the treatment that was afforded others, which can be cognizable under principles of equal protection, from bare complaints of governmental unfairness, which cannot." Lillemoe, 344 F. Supp. 3d at 228 (quoting Quezada v. Marshall, 915 F. Supp. 2d 129, 135 (D.D.C. 2013)). Ordinarily, whether an individual is similarly situated to the plaintiff is a question of fact better decided at summary judgment or by a jury. Id. But Grivnow's complaint does not identify anyone who was similarly situated to him but treated differently.[6] He has therefore failed to state

---

[6] Even if Grivnow had identified a similarly-situated comparator who was treated differently, his claim would still fail. "[T]he Supreme Court has recently held that the 'class of one' theory of equal protection does not apply when the government acts as an employer because

an equal protection claim.

Grivnow next alleges he was denied procedural due process because the adjudicators of his IMPACT score were biased. This is insufficient to state a claim under the Due Process Clause, because even if Grivnow's initial reviewers were biased against him, Grivnow was entitled to further administrative process before other decisionmakers and he did not avail himself of that process. Under the CMPA, Grivnow had a right to appeal his termination and IMPACT score to the D.C. OEA, which can reinstate an employee and award backpay. D.C. Mun. Reg. tit. 5-E, § 1306.13; see also District of Columbia v. Brown, 739 A.2d 832, 833–34 (D.C. 1999). Had he been unsatisfied with the outcome of his appeal, he would have been entitled to judicial review of the OEA's decision in D.C. Superior Court, then the D.C. Court of Appeals. Bridges v. Kelly, 84 F.3d 470, 472 (D.C. Cir. 1996) (citing D.C. Code § 1–606.3).

Courts in this district have held that the CMPA satisfies the Fifth Amendment's guarantee of due process. See Owens, 923 F. Supp. 2d at 250 (finding that the CMPA procedures satisfy due process under the requirements of Mathews v. Eldridge, 424 U.S. 319 (1976)). Grivnow was entitled to constitutionally adequate process, but he "simply failed to take advantage of all the process due him." Yates v. District of Columbia, 324 F.3d 724, 726 (D.C. Cir. 2003); see also id. (finding the WTU's collective bargaining agreement with the district "contained grievance procedures incorporating the basic elements of constitutional due process: notice and the opportunity to be heard"). Grivnow has therefore failed to state a claim.

---

'government offices could not function if every employment decision became a constitutional matter.'" Kelley, 893 F. Supp. 2d at 122 (citing Engquist v. Or. Dep't of Agric., 553 U.S. 591, 598–99 (2008)).

E. Leave to Amend

Finally, Grivnow requests leave to file any amendments to his complaint that are necessary to state a viable claim. Pls.' Opp'n at 4.

A court should freely give leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). "The court should deny leave only where there is an 'apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment.'" Zalduondo v. Aetna Life Ins. Co., 845 F. Supp. 2d 146, 160 (D.D.C. 2012) (alteration in original) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see also James Madison Ltd. by Hecht v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996) ("Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss.").

The Court will deny Grivnow's request to further amend his complaint. As explained above, the Court lacks jurisdiction over the majority of Grivnow's claims, which must be pursued before the PERB. Additional factual allegations relating to Grivnow's employee grievances would not alter that outcome, as the CMPA was intended to address "virtually every conceivable personnel issue among the District, its employees, and their unions." Younger, 60 F. Supp. 3d at 139 (quoting McManus, 530 F. Supp. 2d at 77). Furthermore, Grivnow has amended his complaint twice already, yet those amendments did not cure the deficiencies previously identified by the defendants. For those reasons, the Court will deny leave to amend as futile.

## IV. Conclusion

For the foregoing reasons, the Court will grant the Defendants' [39] Motion to Dismiss in part and deny it in part. A separate Order shall accompany this memorandum opinion.

**SO ORDERED**.

                                              CHRISTOPHER R. COOPER
                                              United States District Judge

Date: September 12, 2022